**IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT OF HINDS COUNTY, MISSISSIPPI**

**ESTATE OF LA'MELLO PARKER;**
**L.S., a minor, by and through Kevin Smith his next friend, Individually and on behalf of all entitled to recover** **PLAINTIFFS**

**VS.** **CAUSE NO. 22-cv-00692-WLK**

**MISSISSIPPI DEPARTMENT OF PUBLIC SAFETY;**
**HARRISON COUNTY SHERIFF TROY PETERSON, in his Individual and Official Capacities;**
**HARRISON COUNTY, MISSISSIPPI;**
**HARRISON COUNTY DEPUTY CHRIS ALLEN, in his Individual and Official Capacities;**
**HARRISON COUNTY DEPUTY HARRY MOSKOWITZ, in his Individual and Official Capacities;**
**CITY OF GULFPORT, MISSISSIPPI;**
**GULFPORT POLICE OFFICER MICHAEL MORAN, in his Individual and Official Capacities;**
**JOHN DOE MISSISSIPPI HIGHWAY PATROL TROOPERS 1-8 in their Individual and Official Capacities; and**
**JOHN DOES 1-75** **DEFENDANTS**

## AMENDED COMPLAINT – JURY TRIAL DEMANDED

COME NOW the Plaintiffs, the Estate of La'Mello Parker and L.S., a minor who appears by and through his next friend Kevin Smith, and file this Complaint through their undersigned counsel. In support thereof, the Plaintiffs would show unto this Honorable Court the following:

## PARTIES

1. La'Mello Parker was an innocent 3-month-old infant who was shot to death by a member of the Mississippi Highway Patrol whose identity has been hidden by the Defendants. The Estate of La'Mello Parker is the properly instituted legal entity representing La'Mello's estate, of which Kevin Smith has been named Administrator by order of the 19th Judicial District Court for the Parish of East Baton Rouge, Louisiana. The Estate is a Plaintiff to this action.

EXHIBIT "A"

2. L.S. is La'Mello's half-brother. L.S. is a minor child, and he appears by and through Kevin Smith, his guardian and next friend. He is a party individually and also represents all persons entitled to recover for the wrongful death and civil rights deprivations of La'Mello Parker.

3. Defendant Mississippi Department of Public Safety ("DPS") is a political subdivision of the State of Mississippi with its principal place of business in Hinds County, Mississippi. Additionally, this Defendant is a governmental entity within the meaning of the Mississippi Tort Claims Act. This Defendant may be served with process by service upon the Commissioner of Public Safety, Sean Tindell, or the Attorney General of the State of Mississippi, Lynn Fitch, or as may be otherwise proper under Mississippi law.

4. Harrison County, Mississippi is a municipality organized under the laws of the State of Mississippi. Additionally, this Defendant is a governmental entity within the meaning of the Mississippi Tort Claims Act. This Defendant may be served with process by service upon its Chancery Clerk, Hon. John McAdams, at the Harrison County Courthouse, 1801 23rd Ave, Gulfport, Mississippi, or as may be otherwise proper under Mississippi law.

5. Harrison County Sheriff Troy Peterson is the elected sheriff of Harrison County, Mississippi. He may be served with process at 10451 Larkin Smith Drive, Gulfport, Mississippi. He is sued in his individual and official capacities.

6. Harrison County Sheriff's Deputy Chris Allen is a K9 deputy with the Sheriff's Department of Harrison County, Mississippi. He may be served with process at 10451 Larkin Smith Drive, Gulfport, Mississippi. He is sued in his individual and official capacities.

7. Harrison County Sheriff's Deputy Harry Moskowitz is a deputy with the Sheriff's Department of Harrison County, Mississippi. He may be served with process at 10451 Larkin Smith Drive, Gulfport, Mississippi. He is sued in his individual and official capacities.

8. The City of Gulfport, Mississippi is a municipality organized under the laws of the State of Mississippi. It may by serving Hon. Rashida Bell, City Clerk for Gulfport, Mississippi, at 1410 24th Ave, Gulfport, Mississippi.

9. Gulfport Police Officer Michael Moran is a Gulfport police officer. He may be served at 2220 15th St, Gulfport, Mississippi. He is sued in his individual and official capacities.

10. Defendant John Doe Mississippi Highway Patrol Trooper 1 is a law enforcement officer working for the Mississippi Department of Public Safety's Highway Patrol who shot and killed La'Mello Parker without the authority of law. This Defendant is sued in his individual and official capacities. He may not be served at this time as his identity is unknown to the Plaintiffs.

11. Defendants John Doe Mississippi Highway Patrol Troopers 2-8 are law enforcement officers working for the Mississippi Department of Public Safety's Highway Patrol who shot at La'Mello Parker. These Defendants are sued in their individual and official capacities. They may not be served at this time as their identity is unknown to the Plaintiffs.

12. Defendants John Does 1-75 are unknown individuals and/or entities liable to Plaintiff for the acts and omissions as alleged herein. The names and capacities of Defendants John Does 1-75 inclusive, whether individual, corporate, or otherwise, are presently unknown to Plaintiffs, who therefore sue said Defendants by fictitious names and will further seek leave of this Honorable Court to amend this Complaint to show their true names and capacities when the same are ascertained. Plaintiffs allege upon information and belief each of the Defendants designated herein as a Doe is responsible in some manner and liable herein to Plaintiffs by

reason of negligence, wanton and reckless misconduct, deprivation of civil rights, and/or in some other manner whether alleged herein in this Complaint or not, and by such wrongful conduct, said Defendants, each of them, proximately caused the injuries, deprivations, and damages occasioned herein.

13. At all times material to this Complaint, Defendants were acting under the color of law, and/or under the color of the statutes, customs, ordinances, and usage of the State of Mississippi and/or their respective municipalities.

**JURISDICTION AND VENUE**

14. This Court has jurisdiction over the parties and the subject matter of this lawsuit. Pursuant to Mississippi Code Annotated Section 11-46-1, *et seq.,* timely notice pursuant to the law was given, and over ninety (90) days have passed as required by Statute. Further, this Court has jurisdiction over all of the parties. Venue is proper in Hinds County as Defendant Department of Public Safety is headquartered and has its principal place of business in the First Judicial District of Hinds County, Mississippi. Acts and omissions of Defendant Department of Public Safety, as set forth herein – in particular the refusal and ultimate failure to coordinate the law enforcement response to the multijurisdictional violent crime episode described herein and the failure to prepare and implement a training program to effectively prepare the Defendant officers for said multijurisdictional violent crime episode – recklessly endangered La'Mello Parker and occurred in Hinds County, Mississippi.

**FACTS**

15. Around noon on May 3, 2021, East Baton Rouge Sheriff's Department detectives responded to a call about a shooting in Baker, Louisiana. When they arrived, they found two people shot dead and a baby, La'Mello Parker, missing.

16. During the investigation, the detectives developed Eric Smith, La'Mello's father, as a suspect in the shootings and kidnapping.

17. While the detectives began their search for Smith, a warrant was signed for his arrest. Members of the Louisiana State Police Fugitive Task Force and East Baton Rouge deputies worked to obtain Smith's location via cell tower. They quickly located him on I-10 eastbound in Ascension Parish, Louisiana.

18. Eventually, Louisiana law enforcement officers caught up with Smith near the Mississippi state line. Once Smith reached Mississippi, law enforcement officers from the Mississippi Department of Public Safety's Mississippi Highway Patrol (MHP) and the Hancock County Sheriff's Office began following Smith.

19. Near mile marker (MM) 11, a Hancock County deputy deployed spike strips on I-10 in an effort to stop Smith's vehicle. The spike strips punctured multiple tires, and Smith slowed his vehicle to a near stop.

20. Smith then exited the vehicle, holding La'Mello to his chest. Smith then pointed a firearm at one of the MHP troopers, and fired one round at a trooper.

21. Not one single officer returned fire.

22. Smith then reentered his vehicle and continued driving east at a slow rate of speed.

23. At MM 13, a Regional Task Force made up of MBI, MDOC, US Marshals Service, Harrison County Sheriff's Department, and Biloxi Police Department law enforcement officers saw multiple Hancock County Sheriff's Deputy vehicles pursuing Smith's car on I-10. The members of this task force, including the Harrison County Sheriff's Department officer,

were told about Smith shooting at a law enforcement officer near MM 11, and – importantly – ***that La'Mello was in the car***. These officers joined the pursuit at MM 13.

24. A Homeland Security Investigations ("HSI") helicopter based in Louisiana began following Smith's car around MM 20. Using a Forward Looking InfraRed ("FLIR") camera system, a Homeland Security Investigations agent riding in the helicopter was able to give detailed information about what was happening inside Smith's vehicle. Specifically, the HSI agent was able to tell other officers that Smith had a handgun in his right hand and that he was **holding La'Mello against his chest with his right arm**.

25. Near MM 20, Biloxi Police Department Officer Todre Clopton, who was working with the Regional Task Force, contacted Biloxi PD and made them aware of the pursuit headed their way. Biloxi Police Department then began to assemble and deploy their Special Response Team, which is made up of sniper, tactical entry, and hostage negotiation teams.

26. Throughout this portion of the pursuit, there were repeated communications between officers **that Smith was holding La'Mello against his chest**. In addition to this being verified by the HSI agent, multiple officers at the front of the pursuit communicated that **they could see Smith holding a gun in one hand and La'Mello in the other**.

27. MHP then tried to use spike strips at MM 29, but were unsuccessful in puncturing the remaining tires. They narrowed the roadway using other vehicles at MM 31 and were successful in forcing Smith to ride over another set of spike strips, which punctured the remaining tires.

28. Near MM 35, Harrison County Sheriff's Department Dispatch relayed information to its officers which it received from the HSI agent in the helicopter that La'Mello

was not in the passenger seat. **Harrison County Dispatch then relayed to officers that Smith was holding La'Mello against his chest.**

29. Biloxi Police had established a roadblock at the Cedar Lake Boulevard exit, near MM 44, complete with snipers and hostage negotiators. Due to the Defendants' complete lack of communication and failure to intervene, La'Mello would never reach this point.

30. MHP officers, due to their complete and utter failure of communication with Biloxi, asked that officers try to move Smith to the right lane of the interstate (south lane of the eastbound portion of I-10). MHP then established a roadblock at MM 41 that would force Smith's vehicle off to the right.

31. As Smith's vehicle neared MM 41, a supervisory officer with the Harrison County Sheriff's Department, believed to be Harrison County Sheriff Troy Peterson himself, ordered deputies to bring an end to the pursuit by pushing Smith's car off the interstate. This was ordered with knowledge that La'Mello was in the car, and despite the fact that Biloxi's Special Response Team had established a roadblock with hostage negotiators and snipers present merely moments ahead, and despite the fact that MHP had established its own "slanted" roadblock to guide Smith off of the road.

32. At this point, MHP vehicles were in the lead behind Smith. In fact, MHP vehicles blocked the entirety of the eastbound lanes of I-10 just behind Smith. Before the convoy reached MM 41 where the MHP roadblock was located, Defendant Harrison County K9 Deputy Chris Allen drove around the MHP vehicles and rammed Smith's vehicle from behind.

33. In ramming Smith's vehicle, K9 Deputy Allen drove his vehicle and Smith's vehicle into the median, which was muddy from recent rain. Smith's vehicle spun nearly 180 degrees and was facing west, inoperable. K9 Deputy Allen's car was side-by-side with Smith's,

with their driver's side doors nearly touching. K9 Deputy Allen was then able to drive his car forward approximately 15 feet before it became stuck again.

34. Defendant Allen then left his car and walked towards the other officers who had taken positions of cover. Defendant Allen then stopped approximately 15 feet from Smith's driver's door, exposed to the line of fire and not seeking cover. **Defendant Allen then drew his weapon and pointed it at Smith, who was holding La'Mello.** Defendant Allen was not alone, as multiple John Doe Defendants also pointed their weapon at Smith, when they all knew Smith was holding La'Mello. At no point did these officers claim that Smith was pointing a weapon at them when they drew theirs on him and La'Mello.

35. A few seconds later, Defendant Allen noticed that the police dog had exited his vehicle. The dog ran along the opposite side of Smith's vehicle, and then continued to run away from Smith's vehicle towards the front of a parked law enforcement vehicle. Defendant Allen then lowered his weapon and tried to corral the dog.

36. While Defendant Allen was chasing his dog, Smith lowered the window to his car and fired a shot. Unlike the first time that Smith fired at officers some 20 miles west, this time **at least 10 officers opened fire** on the vehicle, mortally wounding La'Mello**. Each and every law enforcement officer who fired his weapon knew La'Mello was innocent, helpless, and in the line of their fire.**

37. Across the interstate, traffic was at a standstill on the westbound portion of I-10 as well. When the Harrison County Sheriff's Department ordered Smith's vehicle stopped, dozens of citizens were stuck in their vehicles in the westbound lanes, behind Smith's vehicle. One terrified citizen video-recorded the incident.

38. The citizen who recorded the video can be heard talking to a female passenger inside of his vehicle. Once Defendant Allen rammed Smith's car to a stop across the interstate from the man recording the video, the citizen said to his passenger "We don't want to be over here. A lot of bullets could be flying this way." His passenger, nearly in tears, says she doesn't want to be over here, and pleads for him to roll the window up. The man responds by correctly stating, "It ain't gonna help, baby."

39. The fact that La'Mello was inside Smith's car was no secret; it was public knowledge. On the aforementioned video, the female passenger can be heard yelling "they need to be careful! There's a baby in there!" after law enforcement fired dozens of bullets into Smith's car. The man recording the video responds by saying "hopefully he's not anymore." Seconds later, the man sorrowfully says, "oh no, the baby just came out!" as law enforcement officers removed La'Mello from the car. Tearfully, as the video ends, the citizen can be heard saying, "oh no, they shot the baby."

40. The law enforcement officers who fired weapons at the car La'Mello was in are: Harrison County Deputy Harry Moskowitz, Gulfport Police Officer Michael Moran, MDOC/US Marshall Task Force Officer Sam Tucker, and John Doe MHP Troopers 1-8.

41. At the conclusion of the investigation into this officer-involved shooting, ballistics testing revealed that John Doe MHP Trooper 1 fired the shot that killed La'Mello. Despite requests from Plaintiffs' counsel, the identity of this trooper has remained hidden by law enforcement to this point.

42. Upon information and belief, each and every defendant law enforcement officer involved in this matter received their law enforcement training and certification by the Mississippi Department of Public Safety.

43. The defendant officers knowingly, willingly, intentionally, and with reckless disregard for the safety of La'Mello Parker and others used deadly force because they were not properly trained to handle situations where innocent civilians are in the line of fire.

44. Each law enforcement officer Defendant was trained by the agents of Defendant Mississippi Department of Public Safety, who implemented a training program designed and approved by the said Defendant at its headquarters in Jackson, Mississippi. This training program is highly deficient in that it fails to conform to national standards and norms regarding use of firearms when innocent civilians are in harm's way.

45. Further, such training is ineffective in that each and every Defendant officer wholly abandoned their duties to refrain from using deadly force when innocent civilians may be harmed by the same. It is a bedrock, foundational principal of law enforcement training that officers should refrain from the use of deadly force when confronted by a situation in which innocent civilians may be injured or killed. Each Defendant officer violated this basic trust we the public place in them, and they did so because of a failure of training by Defendant Department of Public Safety.

46. Defendant Mississippi Department of Public Safety is responsible for interagency communication during times of ongoing multijurisdictional violent criminal activity, and for training law enforcement officers – including the Defendant officers and agencies in this action – to utilize and rely upon Defendant Mississippi Department of Public Safety to coordinate efforts to stop ongoing violent criminal activity.

47. Once the chase entered Mississippi, there was a fatal lack of communication between the law enforcement agencies. In fact, this was the conclusion of the grand jury that investigated the case.

48. Defendant Mississippi Department of Public Safety's failure to fulfill its duty to facilitate interagency communication evinced a reckless disregard for the safety of La'Mello Parker and the innocent citizens of south Mississippi who were also in the line of fire.

**COUNT I – RECKLESS ENDANGERMENT BY MISSISSIPPI DEPARTMENT OF PUBLIC SAFETY**

49. The Plaintiffs hereby incorporate by reference and re-allege the information set forth in all preceding paragraphs as fully set forth herein.

50. Once the chase entered Mississippi, there was a fatal lack of communication between the law enforcement agencies. In fact, this was the conclusion of the grand jury that investigated the case.

51. Defendant Mississippi Department of Public Safety is responsible for the training and certification of law enforcement officers in the State of Mississippi, including the Defendant officers in this case.

52. Defendant DPS has a duty to train law enforcement officers to safely and responsibly handle active shooter and hostage situations like the one at issue in this case. Defendant DPS wholly failed to meet this duty, and in doing so recklessly endangered La'Mello Parker.

53. The Mississippi Department of Public Safety, as the entity responsible for administering the Mississippi Highway Patrol and training and certifying law enforcement officers in the State of Mississippi, has a duty to establish a chain of command and communication in situations such as the one in which La'Mello was killed. The failure to do so recklessly endangers the citizens of this state in general, and on May 3, 2021, it endangered dozens of citizens on the westbound lanes of I-10 and La'Mello Parker in particular.

54. Chains of command and communication are not unheard of in the United States, nor are they even cutting edge. They are standard law enforcement practice and expectation. Through acts and omissions of DPS leaders in Jackson over the preceding years, Defendant DPS wholly failed to establish command and communications structures for multijurisdictional pursuits such as this one. In doing so, it totally abdicated its role and recklessly endangered La'Mello Parker, leading directly to his death. For this reason and for the other reasons set forth herein, Defendant DPS is liable to the Plaintiffs pursuant to the Mississippi Tort Claims Act.

**COUNT II – RECKLESS ENDANGERMENT BY HARRISON COUNTY**

55. The Plaintiffs hereby incorporate by reference and re-allege the information set forth in all preceding paragraphs as fully set forth herein.

56. Defendant Harrison County participated in the reckless endangerment outlined in Count I through failure to establish and maintain chain of command and communication during this horrible event, and is liable to the Plaintiffs for said reckless endangerment.

57. Further, Harrison County, through its Sheriff's Department, devised a scheme to ram the car in which La'Mello was a helpless passenger into the median. This plan in and of itself evinced a reckless disregard for La'Mello's safety, in that it put him in danger of serious bodily injury as an unrestrained passenger and also severely escalated a situation in which he was being held by a man who was highly agitated, armed, and known by law enforcement to be willing to use lethal force against law enforcement.

58. For these reasons and for the other reasons set forth herein, Defendant Harrison County is liable to the Plaintiffs pursuant to the Mississippi Tort Claims Act.

## COUNT III – RECKLESS ENDANGERMENT BY INDIVIDUAL LAW ENFORCEMENT OFFICERS

59. The Plaintiffs hereby incorporate by reference and re-allege the information set forth in all preceding paragraphs as fully set forth herein.

60. Defendant Allen, by ignoring the warnings that La'Mello was inside the car and unrestrained, recklessly endangered La'Mello by ramming the car and forcing an agitated, armed, and mentally unstable Smith into a standoff with police at the improper time and location. As set forth above, there were two separate roadblocks already in place when Allen drove around a flotilla of MHP vehicles to ram Smith's vehicle. Further, specially trained officers were in place to handle the ensuing standoff and extricate La'Mello without harm. Allen prevented that from happening by taking it upon himself to ram Smith's car into submission.

61. Defendant Allen did not act alone, however. Allen was instructed to ram the vehicle short of the roadblock by a supervisory law enforcement officer within the Harrison County Sheriff's Department. Multiple officers identified that supervisory officer to be Harrison County Sheriff Troy Peterson himself. Ordering the ramming of a car in which an unrestrained infant is present is the definition of reckless endangerment. The command also served to short circuit the much safer, well-planned Biloxi roadblock waiting ahead.

62. Each and every one of the Defendants who shot (Moskowitz, Moran, and the 8 John Doe MHP Troopers) did so in contravention of standard law enforcement training and in complete reckless disregard for La'Mello's safety. When an innocent citizen is in the line of fire, officers are to take cover and wait. The safety of the innocent citizen – those the officers swear an oath to protect – is always paramount.

63. This was not a video game or a Hollywood production – Smith did not have unlimited ammunition. The Defendant officers only needed to wait from the safety of cover until

Smith stopped shooting or ran out of ammunition. That is what law enforcement is trained to do in situations such as this one and is exactly what the dozens of other law enforcement officers at the scene of La'Mello's shooting did. It is also what each and every officer present thirty miles earlier at MM 11 did.

64. As a result of the foregoing, the entities employing these officers (DPS, Gulfport, and Harrison County) are liable to the Plaintiffs pursuant to the MTCA for the damages they inflicted.

**COUNT IV – DEPRIVATION OF CIVIL RIGHTS – AS TO ALL DEFENDANTS**

65. The Plaintiffs hereby incorporate by reference and re-allege the information set forth in all preceding paragraphs as fully set forth herein.

66. This cause of action is brought by the Plaintiffs against the Defendants for violation of La'Mello Parker's civil rights, both under the Constitution of the United States of America and of the Constitution of the State of Mississippi.

67. By their conduct as described herein and because they were acting under color of state law to deprive La'Mello Parker from his civil rights, the Defendants are liable for their violation of 42 U.S.C. § 1983, which prohibits the deprivation under color of state law of rights secured under the Constitution of the United States.

68. Defendants did willfully, deliberately, intentionally, and recklessly violate the civil rights granted unto La'Mello Parker by the Fourth and Fourteenth Amendments to the Constitution of the United States of America, as well as the similar rights and guarantees granted to La'Mello Parker by the similar clauses of the Constitution of the State of Mississippi.

69. Specifically, the Defendants violated La'Mello Parker's Fourth and Fourteenth Amendment rights to be free from unreasonable seizure by shooting him and the car in which he

was unrestrained, as well as ramming the car in which he was unrestrained. The Defendants also violated La'Mello's Fourth and Fourteenth Amendment rights by using excessive force as set forth herein. La'Mello was an innocent baby who was being held hostage. The Defendants all knew of his presence and his vulnerability. They also knew he posed them no harm. Regardless, these Defendants seized him and used excessive force against him. They rammed the car in which he was an unrestrained passenger, needlessly and dangerously escalated the situation leading to La'Mello's death, and pointed their weapons at him needlessly, and opened fire at him when it was completely unnecessary. One Defendant actually struck La'Mello with a bullet and killed him.

70. Defendants' actions and inactions are explicit violations of La'Mello's rights under the constitutional provisions listed herein. As a direct and proximate result of Defendants' actions, La'Mello suffered injuries and death.

71. At all relevant times, the Defendants were acting under the color of law.

72. As a result of the foregoing, each and every Defendant is liable to the Plaintiffs pursuant to 42 U.S.C. § 1983 for the deprivation of La'Mello's civil rights.

**COUNT V – FAILURE TO INTERVENE – AS TO ALL DEFENDANTS**

73. The Plaintiffs hereby incorporate by reference and re-allege the information set forth in all preceding paragraphs as fully set forth herein.

74. Each and every one of the Defendants herein had a duty to prevent the others from depriving La'Mello of his civil rights and refused to do so.

75. Officers have a duty to protect individuals from constitutional violations by fellow officers. Therefore, an officer who witnesses a fellow officer violating an individual's constitutional rights is liable to the victim for failing to intervene.

76. The Defendants failed to protect La'Mello from a danger they proactively created and aggravated. Further, the entity Defendants either ordered the officer Defendants to conduct the deprivations of civil rights directly, did nothing to stop the deprivations as they were occurring, or trained/condoned such deprivations through prior failures of training and/or supervision.

77. There was no need to stop the pursuit at the point in time in which it was stopped, a short distance from two planned roadblocks. Defendant Allen recklessly ramming the vehicle in which La'Mello was unrestrained and officers drawing their weapons towards and indiscriminately firing their weapons La'Mello's direction placed La'Mello at a substantial risk of harm. Further, Defendant John Doe MHP Trooper 1 shot La'Mello, causing him physical harm and death.

78. The Defendants' actions were unnecessary and excessive considering the circumstances surrounding the incident.

79. The Defendants' actions and inactions were egregious and arbitrary.

80. The Defendants failed to prevent one another from causing or placing La'Mello in direct and an unreasonable risk of harm, further violating his federal civil liberties.

81. The Defendants each had reason to know that a constitutional violation was about to be, was being, or had been committed by the other, and Defendants had a realistic opportunity to intervene to prevent the risk of harm from occurring.

82. The Defendants were all aware that shooting at a car where an infant was located posed extreme risk to the health of the infant.

83. As a direct and proximate cause of Defendants' actions and inactions, Plaintiffs suffered federal civil rights violations, physical injury, medical expenses, mental and emotional

distress, and wrongful death.

## QUALIFIED IMMUNITY DEFENSES BARRED BY STATUTE

84. The Counts IV and V above against the individual Defendants are made pursuant to the Civil Rights Act of 1871, which has been codified as 42 U.S.C. § 1983.

85. Title 42 of the United States Code has not been codified as positive law, and is therefore merely prima facie evidence of what the statute truly is.

86. The text of the Civil Rights Act of 1871 specifically prohibits the application of any common law defenses to liability for violations of civil rights under color of law. A copy of the Civil Rights Act of 1871 certified by the National Archives and Record Administration is attached hereto as "Exhibit 1." Specifically, the operative part of the statute passed by Congress reads:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall**, any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding,** be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

87. The doctrine of qualified immunity arose out of the application of Mississippi's common law custom of "good faith immunity" in the case of *Pierson v. Ray*, a case in which a Freedom Rider was arrested and wrongfully prosecuted for violating Mississippi's blatantly unconstitutional disorderly conduct statute. As a result of the plain language of the statute as passed by Congress, the doctrine of qualified immunity – based as it is on State custom – is barred and may not be relied upon by any Defendant and may not be considered by this Court.

## COUNT VI - MONELL LIABILITY

88. The Plaintiffs hereby incorporate by reference and re-allege the information set forth in all preceding paragraphs as fully set forth herein.

89. Further, at all times, Defendants DPS, Gulfport, and Harrison County failed to implement protocols and training that would have prevented the death of La'Mello Parker.

90. The formal and informal actions and inactions of these three Defendants reflect policies, practices, customs, and procedures that permit and cause constitutional violations. Specifically, these three Defendants refused to develop policies, train, and supervise their officers regarding chain of command and interagency communications issues. This failure led directly to a confused, uncoordinated law enforcement response, which was the moving cause behind La'Mello's death. These policies and/or customs were implemented by the leadership of each defendant.

91. Further, these Defendants sanctioned the following customs, practices, and policies:

a. Using unreasonable and excessive force in hostage situations

b. Using unreasonable and excessive force in vehicular pursuits

c. Using unreasonable and excessive force in vehicular pursuits when unrestrained infants are involved,

d. Failing to adequately supervise or observe its officers

e. Failing to train its officers in alternative means of conflict resolution aside from the use of firearms

f. Failing to discharge officers who have a pattern or practice of misbehavior,

g. Failing to discharge officers who have a pattern or practice of using excessive force; and/or

h. Failing to monitor the use of firearms by officers;

92. At the time Defendant Officers violated La'Mello's civil rights, they were acting pursuant to an official policy, practice, custom and procedure overlooking and/or authorizing law enforcement officers' excessive use of force and unlawful seizure.

93. The state grand jury investigating this matter came to this very same conclusion.

**PUNITIVE DAMAGES**

94. The conduct of Defendants as set forth hereinabove was willful, malicious, oppressive and/or reckless, grossly negligent and was of such a nature that punitive damages should be imposed in an amount commensurate with the wrongful acts alleged herein.

**PRAYER**

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that upon the filing of this Complaint that this Honorable Court will set this matter for a full and complete trial by jury on the merits and upon completion of the same, enter a judgment granting damages for the following:

a. Permanent emotional injury;

b. Pain and suffering;

c. Economic damages;

d. Loss of enjoyment of life;

e. Wrongful death;

f. Past, present and future emotional distress and mental anguish;

g. Court costs;

h. Pre- and post-judgment interest;

i. Attorney's fees pursuant to 42 U.S.C. § 1988;

j. Any and all out of pocket expenses; and

k. All other damages of every kind to the Plaintiffs to which they are entitled by law.

Respectfully submitted, this the 25th day of April, 2023.

/s/ J. Matthew Eichelberger
J. Matthew Eichelberger (MSB No. 101060)
Attorney for the Plaintiffs

Eichelberger Law Firm, PLLC
308 E Pearl St, Ste 201
Jackson, MS 39201
Telephone: 601-292-7940
Facsimile: 601-510-9103
Email: matt@ike-law.com
Web: www.ike-law.com

**CERTIFICATE OF SERVICE**

I, the undersigned attorney for Plaintiff, do hereby certify that I have this date filed by MEC the above and foregoing document.

/s/ J. Matthew Eichelberger
J. Matthew Eichelberger



NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

**To all to whom these presents shall come. Greeting:**

By virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf, under the seal of the National Archives of the United States, that the attached reproduction(s) is a true and correct copy of documents in his custody.

| | |
|---|---|
| SIGNATURE | D J Edelin |
| NAME: DENNIS MICHAEL EDELIN | DATE: 8/19/22 |
| TITLE: CHIEF, ARCHIVES 1 RESEARCH ROOM | |
| NAME AND ADDRESS OF DEPOSITORY: National Archives and Records Administration<br>700 Pennsylvania Avenue, NW<br>Washington, DC 20408 | |

NA FORM 14007 (10-86)

[illegible] law, statute, ordinance, regulation, custom, or usage of [illegible] State, shall subject, or cause to be subjected, any person [illegible] the jurisdiction of the United States to the deprivation of [illegible] rights, privileges, or immunities secured by the Constitution [illegible] the United States, shall, any such law, statute, ordinance, [illegible], custom, or usage of the State to the contrary notwith[illegible]ing, be liable to the party injured in any action at [illegible] in equity, or other proper proceeding for redress; such [illegible] to be prosecuted in the several district or circuit courts [illegible] United States, with and subject to the same rights of appeal, [illegible] error, and other remedies provided in like cases in [illegible] courts, under the provisions of the act of the ninth of April, eighteen hundred and sixty-six, entitled "An act to protect all persons in the United States in their civil rights, and to furnish the means of their vindication," and the other remedial laws of the United States which are in their nature applicable in such cases.

Sec. 2. That if two or more persons within any State or Territory of the United States shall conspire together to overthrow, or to put down, or to destroy by force the Government of the United States, or to levy war against the United States, or to oppose by force the authority of the Government of the United States, or by force,

EXHIBIT "A"



H R 320

Forty-second

Congress of the United States, At the First Session,

Begun and held at the CITY OF WASHINGTON, in the DISTRICT OF COLUMBIA, on Saturday the fourth day of March, eighteen hundred and seventy-one.

AN ACT to enforce the provisions of the fourteenth amendment to the Constitution of the United States, and for other purposes.

Be it Enacted, by the Senate and House of Representatives of the United States of America in Congress assembled, That any person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding, be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress; such proceeding to be prosecuted in the several district or circuit courts of the United States, with and subject to the same rights of appeal, review upon error, and other remedies provided in like cases in such courts, under the provisions of the act of the ninth of April, eighteen hundred and sixty-six, entitled "An act to protect all persons in the United States in their civil rights, and to furnish the means of their vindication," and the other remedial laws of the United States which are in their nature applicable in such cases.

Sec. 2. That if two or more persons within any State or Territory of the United States shall conspire together to overthrow, or to put down, or to destroy by force the Government of the United States, or to levy war against the United States, or to oppose by force the authority of the Government of the United States, or by force,

EXHIBIT "A"

intimidation, or threat to prevent, hinder, or delay the execution of any law of the United States, or by force to seize, take, or possess any property of the United States contrary to the authority thereof, or by force, intimidation, or threat to prevent any person from accepting or holding any office or trust or place of confidence under the United States, or from discharging the duties thereof, or by force, intimidation, or threat to induce any officer of the United States to leave any State, district, or place where his duties as such officer might lawfully be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or to injure his person while engaged in the lawful discharge of the duties of his office, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duty, or by force, intimidation, or threat to deter any party or witness in any court of the United States from attending such court, or from testifying in any matter pending in such court fully, freely, and truthfully, or to injure any such party or witness in his person or property on account of his having so attended or testified, or by force, intimidation, or threat to influence the verdict, presentment, or indictment of any juror or grand juror in any court of the United States, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or on account of his being or having been such juror, or shall conspire together, or go in disguise upon the public highway or upon the premises of another for the purpose, either directly or indirectly, of depriving any person or any class of persons of the equal protection of the laws, or of equal privileges or immunities under the laws, or for the purpose of preventing or hindering the constituted authorities of any State from giving or securing to all persons within such State the equal protection of the laws, or shall conspire together for the purpose of in any manner impeding, hindering, obstructing, or defeating the due course of justice in any State or Territory, with intent to deny to any citizen of the United States the due and equal protection of the laws,

EXHIBIT "A"

or to injure any person in his person or his property for lawfully enforcing the right of any person or class of persons to the equal protection of the laws, or by force, intimidation, or threat to prevent any citizen of the United States lawfully entitled to vote from giving his support or advocacy in a lawful manner towards, or in favor of the election of any lawfully qualified person as an elector of President or Vice President of the United States, or as a member of the Congress of the United States, or to injure any such citizen in his person or property on account of such support or advocacy, each and every person so offending shall be deemed guilty of a high crime, and, upon conviction thereof in any district or circuit court of the United States or district or supreme court of any Territory of the United States having jurisdiction of similar offenses, shall be punished by a fine not less than five hundred nor more than five thousand dollars, or by imprisonment, with or without hard labor, as the court may determine, for a period of not less than six months nor more than six years, as the court may determine, or by both such fine and imprisonment as the court shall determine. And if any one or more persons engaged in any such conspiracy, shall do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby any person shall be injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the person so injured or deprived of such rights and privileges may have and maintain an action for the recovery of damages occasioned by such injury or deprivation of rights and privileges against any one or more of the

EXHIBIT "A"

persons engaged in such conspiracy, such action to be prosecuted in the proper district or circuit court of the United States, with and subject to the same rights of appeal, review upon error, and other remedies provided in like cases in such courts under the provisions of the act of April ninth, Eighteen hundred and sixty-six, entitled 'An act to protect all persons in the United States in their civil rights, and to furnish the means of their vindication.'

Sec. 3. That in all cases where insurrection, domestic violence, unlawful combinations, or conspiracies in any State shall so obstruct or hinder the execution of the laws thereof and of the United States, as to deprive any portion or class of the people of such State of any of the rights, privileges, or immunities or protection named in the Constitution and secured by this act and the constituted authorities of such State shall either be unable to protect, or shall, from any cause, fail in or refuse protection of the people in such rights, such facts shall be deemed a denial by such State of the equal protection of the laws to which they are entitled under the Constitution of the United States; and in all such cases or whenever any such insurrection, violence, unlawful combination, or conspiracy, shall oppose or obstruct the laws of the United States or the due execution thereof, or impede or obstruct the due course of justice under the same, it shall be lawful for the President, and it shall be his duty, to take such measures, by the employment of the militia or the land and naval forces of the United States, or of either, or by other means as he may deem necessary for the suppression of such insurrection, domestic violence, or combinations; and any person who shall be arrested under the provisions of this and the preceding section shall be delivered to the marshal of the proper district, to be dealt with according to law.

Sec. 4. That whenever in any State or part of a State the unlawful combinations named in the preceding section of this act shall be

EXHIBIT "A"



organized and armed, and so numerous and powerful as to be able by violence to either overthrow or set at defiance the constituted authorities of such State and of the United States within such State, or when the constituted authorities are in complicity with, or shall connive at the unlawful purposes of, such powerful and armed combinations; and whenever, by reason of either or all of the causes aforesaid, the conviction of such offenders and the preservation of the public safety shall become in such district impracticable, in every such case such combinations shall be deemed a rebellion against the government of the United States, and during the continuance of such rebellion, and within the limits of the district which shall be so under the sway thereof, such limits to be prescribed by proclamation, it shall be lawful for the President of the United States, when in his judgment the public safety shall require it, to suspend the privileges of the writ of habeas corpus, to the end that such rebellion may be overthrown: Provided, That all the provisions of the second section of an act entitled "An act relating to habeas corpus and regulating judicial proceedings in certain cases" approved March third, eighteen hundred and sixty-three, which relate to the discharge of prisoners other than prisoners of war, and to the penalty for refusing to obey the order of the court, shall be in full force so far as the same are applicable to the provisions of this section: Provided further, That the President shall first have made proclamation as now provided by law, commanding such insurgents to disperse: And provided also, That the provisions of this section shall not be in force after the end of the next regular session of Congress.

~~Sec 5. That nothing herein contained shall be construed to supersede or repeal any former act or law except so far as the same may be repugnant thereto; and any offenses heretofore committed against the tenor of any former act shall be prosecuted and any proceeding already commenced for the prosecution thereof shall be continued and completed the~~

EXHIBIT "A"



~~same as if this act had not been passed, except so far as the provisions of this act may go to sustain and validate such proceedings.~~

Sec 5. That no person shall be a grand or petit juror in any court of the United States upon any inquiry, hearing, or trial of any suit, proceeding, or prosecution based upon or arising under the provisions of this act who shall, in the judgment of the court, be in complicity with any such combination or conspiracy, and every such juror shall before entering upon any such inquiry, hearing or trial, take and subscribe an oath in open court that he has never, directly or indirectly, counselled, advised, or voluntarily aided any such combination or conspiracy; and each and every person who shall take this oath, and shall therein swear falsely, shall be guilty of perjury, and shall be subject to the pains and penalties declared against that crime, and the first section of the act entitled "An act defining additional causes of challenge and prescribing an additional oath for grand and petit jurors in the United States courts," approved June seventeenth, eighteen hundred and sixty-two be, and the same is hereby repealed.

EXHIBIT "A"

Sec. 6. That any person or persons, having knowledge that any of the wrongs conspired to be done and mentioned in the second section of this act are about to be committed, and having power to prevent, or aid in preventing the same, shall neglect or refuse so to do, and such wrongful act shall be committed, such person or persons shall be liable to the person injured, or his legal representatives for all damages caused by any such wrongful act which such first named person or persons by reasonable diligence could have prevented; and such damages may be recovered in an action on the case in the proper circuit court of the United States, and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in such action. Provided, that such action shall be commenced within one year after such cause of action shall have accrued; and if the death of any person shall be caused by any such wrongful act and neglect, the legal representatives of such deceased person shall have such action therefor, and may recover not exceeding five thousand dollars damages therein, for the benefit of the widow of such deceased person, if any there be, or if there be no widow, for the benefit of the next of kin of such deceased person.

Sec. 7. That nothing herein contained shall be construed to supersede or repeal any former act or law except so far as the same may be repugnant thereto; and any offences heretofore committed against the tenor of any former act shall be prosecuted, and any proceeding already commenced for the prosecution thereof shall be continued and completed, the same as if this act had not been passed except so far as the provisions of this act may go to sustain and validate such proceedings.

J. G. Blaine
Speaker of the House of Representatives

Approved April 20th 1871
U. S. Grant

Henry B. Anthony
President of the Senate pro tempore

EXHIBIT "A"