IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

**ESTATE OF LA'MELLO PARKER; L.S.,**        **PLAINTIFFS**
*a minor, by and through Kevin Smith, his*
*next friend*

**v.**        **CIVIL ACTION NO. 1:23-cv-185-TBM-RPM**

**MISSISSIPPI DEPARTMENT OF**
**PUBLIC SAFETY** *et al.*        **DEFENDANTS**

<u>**MEMORANDUM OPINION AND ORDER**</u>

On May 3, 2021, Eric Smith kidnapped his three-month-old son, La'Mello Parker, after murdering two people, including La'Mello's mother, in Baker, Louisiana. Armed with a gun, and holding La'Mello to his chest, Smith led law enforcement on a prolonged chase down Interstate 10, which included firing his first shot at officers shortly after entering Mississippi. The chase continued and law enforcement finally managed to force Smith's vehicle into the interstate median. This time, Smith rolled down his driver's side window and fired a shot in the direction of a law enforcement officer who was not behind cover. Several officers immediately returned fire, killing Smith. Tragically, La'Mello was also hit by a bullet and later died.

The Plaintiffs are seeking money damages and have sued the Mississippi Department of Public Safety, the City of Gulfport, Harrison County, and four law enforcement officers in their individual and official capacities, alleging violations of La'Mello's Fourth and Fourteenth Amendment rights to be free from unreasonable seizures, under 42 U.S.C. Section 1983. The Plaintiffs also allege violations of state law under the Mississippi Tort Claims Act. The Defendants have now moved to dismiss.

The Plaintiffs have centered their argument in briefing and at a hearing on a theory that law enforcement can never return fire at an active shooter—who has a human shield—unless there is such a clear shot that law enforcement is confident it will not hit the human shield. To that end, the Plaintiffs argue that law enforcement should have let Eric Smith keep shooting, even if he began wounding or killing innocent civilians or police officers, until that clear, unmistakable shot materialized. Anything less, they contend, is a violation of La'Mello's constitutional rights. But they cite to no case law in support of this theory.

Despite sympathy for the devastating loss of La'Mello's life, the Defendants' Motion for Judgment of the Pleadings [37] and Motions to Dismiss [39], [42], and [54] are granted as to the federal law claims. With every federal law claim dismissed, the Court declines to exercise supplemental jurisdiction over the Plaintiffs' remaining state law claims, and they are remanded to state court.

## I. BACKGROUND AND PROCEDURAL HISTORY

This heartbreaking incident began around noon on May 3, 2021, when, according to the Plaintiffs' Amended Complaint, detectives from the East Baton Rouge Sheriff's Department responded to a shooting in Baker, Louisiana, where they found two individuals shot to death and La'Mello Parker, a three-month-old child, missing. [1]-1, p. 4. La'Mello's father, Eric Smith, was suspected of committing the murders and kidnapping, and the detectives began searching for him. *Id.* at p. 5. With assistance from state and local authorities using a cell tower to zero-in on Smith's location, the detectives soon located Smith driving eastbound with La'Mello on Interstate 10 in Ascension Parish, Louisiana. *Id.* By the time Louisiana authorities caught up to him, Smith was

approaching the Mississippi state line, so authorities from the Mississippi Highway Patrol and the Hancock County, Mississippi, Sheriff's Office took over Smith's pursuit. *Id.*

Attempting to end the chase, a Hancock County deputy laid down spike strips across the interstate near mile marker 11. [1]-1, p. 5. These spike strips punctured some of Smith's tires, bringing the vehicle to a near stop. *Id.* Smith then exited the vehicle holding La'Mello to his chest, pointed a gun at a Mississippi Highway Patrolman, fired one shot, reentered his vehicle with La'Mello, and continued driving east on Interstate 10. *Id.* During this brief altercation, no officers returned fire. *Id.*

Two miles down the road, at mile marker 13, a regional task force of law enforcement officers from the Mississippi Bureau of Investigations, the Mississippi Department of Corrections, the United States Marshals Service, the Harrison County Sheriff's Department, and the Biloxi Police Department joined the pursuit. [1]-1, p. 5-6. The task force knew that Smith had just shot at law enforcement and that La'Mello was also in the vehicle. *Id.* at p. 6.

Around mile marker 20, a Homeland Security Investigations helicopter also began following Smith's vehicle. [1]-1, p. 6. Using an infrared camera, the helicopter provided detailed information about what was happening inside Smith's vehicle—that Smith had a handgun in his right hand and was holding La'Mello against his chest. *Id.* Around this same time, the task force alerted a Biloxi Police Department Special Response Team stationed up ahead on Interstate 10 that Smith was heading their way. *Id.* This Special Response Team included a sniper, tactical entry personnel, and hostage negotiation teams. *Id.* They, too, were informed that La'Mello was held against Smith's chest in the vehicle. *Id.*

At mile marker 29, spike strips were again deployed to puncture Smith's remaining tires, but the spikes failed. [1]-1, p. 6. Two miles later, after narrowing the road using other vehicles, law enforcement forced Smith to ride over a third set of spike strips which finally punctured Smith's remaining tires, yet Smith continued to drive the vehicle. *Id.* Near mile marker 35, the Harrison County Sheriff's Department Dispatch once again informed its officers that Smith was holding La'Mello against his chest. *Id.* at p. 6-7.

During this time, two roadblocks had been set up. [1]-1, p. 7. The first was at mile marker 41, in response to the Mississippi Highway Patrol's request to move Smith's vehicle to the right lane of the interstate to force him off the road. *Id.* The second was set up by the Biloxi Special Response Team near mile marker 44 and included snipers and hostage negotiators. *Id.*

But before Smith reached either roadblock, a supervisory officer with the Harrison County Sheriff's Department, allegedly Defendant Sheriff Troy Peterson himself, ordered the pursuit be ended by pushing Smith's vehicle off the interstate. [1]-1, p. 7. In response, Defendant Harrison County K9 Deputy Chris Allen drove around the Mississippi Highway Patrol vehicles who were leading the chase, and rammed Smith's vehicle from behind, forcing both his vehicle and Smith's vehicle into the median. *Id.* Smith's vehicle spun nearly 180 degrees and was now facing in the opposite direction. *Id.* Deputy Allen's vehicle was side-by-side with Smith's, nearly touching driver's side doors. *Id.* at p. 8. Deputy Allen was then able to drive his vehicle forward about 15 feet before getting stuck in the mud. *Id.* Deputy Allen then exited the vehicle and moved toward cover, before stopping, drawing his weapon, and pointing it back at Smith, who was still in his vehicle with La'Mello. *Id.* Other law enforcement officers taking cover nearby also drew their

weapons and pointed them at Smith in his vehicle. *Id.* At this point, no shots had been fired by the officers.

A few seconds later, Deputy Allen noticed that the police dog in his vehicle had escaped and was running free in the middle of the standoff. [1]-1, p. 8. Deputy Allen then lowered his weapon and tried to corral the dog. *Id.* While this was happening, Smith lowered his car window and fired a shot. *Id.* At least ten law enforcement officers then returned fire. *Id.* Smith was killed and tragically, La'Mello was also hit by a bullet intended for Smith and later died.[1] *Id.*

The law enforcement officers who fired their service weapons were Harrison County Deputy Harry Moskowitz, Gulfport Police Officer Michael Moran, Mississippi Department of Corrections/United States Marshal Task Force Officer Sam Tucker, and John Doe Mississippi Highway Patrol Troopers 1-8. [1]-1, p. 9. Ballistics testing later revealed that John Doe Mississippi Highway Patrol Trooper 1 fired the shot that killed La'Mello. *Id.* That trooper's identity remains unknown to the Plaintiffs and the public. *Id.*

The Plaintiffs are Eric Smith's father and Smith's other son (La'Mello's grandfather and brother). After filing their original complaint in Hinds County Circuit Court on November 1, 2022, the Plaintiffs received leave and filed their Amended Complaint [1] on April 25, 2023. They alleged violations of state and federal law and named the Mississippi Department of Public Safety, the City of Gulfport, Harrison County, and, in their individual and official capacities, Harrison County Sheriff Troy Peterson, Harrison County Deputies Chris Allen and Harry Moskowitz, Gulfport Police Officer Michael Moran, John Doe Mississippi Highway Patrol Troopers 1-8, and John Does

---

[1] At the hearing, the Plaintiffs admitted that the bullet that killed La'Mello came from a rifle, not from a handgun. In fact, it was alluded to at the hearing that the only bullets to strike anyone—Smith or La'Mello—came from that rifle.

1-75 as Defendants. Against the Mississippi Department of Public Safety, the City of Gulfport, and Harrison County, the Plaintiffs alleged violations of state law under the Mississippi Tort Claims Act, including reckless endangerment, failure to train, and lack of communication, as well as federal claims under 42 U.S.C. Section 1983, including violations of La'Mello's Fourth and Fourteenth Amendment rights against "unreasonable seizure," use of "excessive force," and failure to intervene.[2] [1]-1, p. 11-12, 14-19. The Plaintiffs have also brought state law reckless endangerment claims under the Mississippi Tort Claims Act and federal claims under 42 U.S.C. Section 1983 against the individual Defendants: Sheriff Peterson, Deputies Allen and Moskowitz, Officer Moran, John Doe Mississippi Highway Patrol Troopers 1-8, and John Does 1-75, alleging the same constitutional violations. [1]-1, p. 12-17. On May 24, 2023, the suit was removed to the United States District Court for the Southern District of Mississippi, Northern Division, before being transferred to the Southern Division.[3] [40], p. 4.

---

[2] The Plaintiffs originally brought municipal liability claims under Section 1983 against the Mississippi Department of Public Safety but have since conceded that they have no viable path to establish that liability against the Mississippi Department of Public Safety as an arm of the state. [45], p. 6. They are correct. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70, 109 S. Ct. 2304, 2312, 105 L. Ed. 2d 45 (1989) (citing *Mt. Healthy Bd. of Ed. v. Doyle*, 429 U.S. 274, 280, 97 S. Ct. 568, 572, 50 L.Ed.2d 471 (1977) (noting that *Monell* liability was limited "to local government units which are not considered part of the State for Eleventh Amendment purposes," and does not apply to "[s]tates or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes.").

[3] In its Notice of Removal, the Mississippi Department of Public Safety removed this case under federal question jurisdiction. [1], p. 2 ("Because Plaintiff is seeking relief for alleged violations of federal law [Section 1983], this Court has jurisdiction over this action pursuant to 28 U.S.C. Section 1331 and Section 1441(a)."). That said, at the motion hearing, a question arose about whether jurisdiction might also be proper based on the diversity of the parties. *See* [1]-1, p. 1. Some Defendants were unsure and thought it might take additional discovery to know for certain. In these cases, the removing party, here the Mississippi Department of Public Safety, bears the burden of establishing jurisdiction. *Miller v. Diamond Shamrock Co.*, 275 F.3d 414, 417 (5th Cir. 2001). Moreover, "the basis upon which jurisdiction depends must be alleged affirmatively and distinctly and cannot be established argumentatively or by mere inference." *Getty Oil Corp. v. Ins. Co. of N. Am.*, 841 F.2d 1254, 1259 (5th Cir. 1988). As a result, the Court may not simply assume that it also has diversity jurisdiction based on hunches at a motion hearing, especially considering the diversity of the parties was never mentioned, let alone "affirmatively and distinctly" alleged, in the Notice of Removal. [1], p. 2-3. After all, "any ambiguities are construed against removal because the removal statute should be strictly construed in favor of remand." *Manguno v. Prudential Prop. & Cas. Ins. Co.*, 276 F.3d 720, 723 (5th Cir. 2002). So the federal questions alleged will remain the only basis for jurisdiction here.

On August 21, 2023, the Mississippi Department of Public Safety moved for Judgment on the Pleadings [37], alleging that the Plaintiffs' state law claims should be dismissed because it is immune under the Mississippi Tort Claims Act's discretionary function, and the Plaintiffs' federal claims should be dismissed because it is entitled to sovereign immunity. [38], p. 5-14. Soon after, Officer Moran moved to dismiss [39], alleging that the Plaintiffs lack standing to bring their claims, or that he is entitled to qualified immunity. [40], p. 9-18. Officer Moran also challenged the sufficiency of service, alleging that the Plaintiffs were improperly granted a second extension of time by the state court to serve several Defendants, including himself.[4] [40], p. 18-19. On September 11, 2023, Sheriff Peterson and Deputies Allen and Moskowitz also moved to dismiss [42], adopting in full Officer Moran's arguments in his Motion [39], Memorandum [40], and Rebuttal [50]. Finally, Harrison County moved to dismiss [54] on January 31, 2024, also adopting Officer Moran's arguments. On February 13, 2024, the City of Gulfport joined Officer Moran's Motion to Dismiss [39]. [55].

## II. STANDARD OF REVIEW

"A motion for judgment on the pleadings under Rule 12(c) is subject to the same standard as a motion to dismiss under Rule 12(b)(6)."[5] *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir.

---

[4] Yet Officer Moran does not cite any caselaw indicating that this Court has the authority to set aside that type of decision from a state court. Given the remand of the remaining state law claims, Officer Moran may be able to raise this issue before the state court.

[5] As noted above, some Defendants have instead moved to dismiss certain claims against them under Rule 12(b)(6), rather than move for Judgment on the Pleadings. [39], [42], and [54]. Those claims would normally be analyzed under the same standard. Yet these same Defendants also challenge constitutional standing, and, while unaddressed by the Parties, these standing claims are properly brought under Rule 12(b)(1), not Rule 12(b)(6). "Article III standing is the only kind of standing required before a federal district court can exercise subject matter jurisdiction." *Abraugh v. Altimus*, 26 F.4th 298, 303 (5th Cir. 2022); "Standing of the constitutional variety—the well-known injury, causation, and redressability trifecta [that is often called 'Article III standing']—is a question of subject matter jurisdiction." *Norris v. Causey*, 869 F.3d 360, 366 (5th Cir. 2017).

2008). To avoid dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. It follows that "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged— but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (quoting FED. R. CIV. P. 8(a)(2)). "This standard 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements." *In re S. Scrap Material Co.*, LLC, 541 F.3d 584, 587 (5th Cir. 2008) (citing *Twombly*, 550 U.S. at 556). Finally, "A defect in the district court's subject matter jurisdiction . . . may be raised at any time by the parties or the court itself and cannot be waived." *Hayes v. Gulf Oil Corp.*, 821 F.2d 285, 290–91 (5th Cir. 1987). "Under Rule 12(b)(1), a party may move to dismiss for lack of subject-matter jurisdiction; under Rule 12(h)(3), '[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.'" *Uptown Grill, L.L.C. v. Camellia Grill Holdings, Inc.*, 46 F.4th 374, 383 n.5 (5th Cir. 2022) (quoting FED. R. CIV. P. 12(h)(3)).

### III. ANALYSIS

#### A. Standing

All the Defendants except for the Mississippi Department of Public Safety first challenge the Plaintiffs' standing to bring these claims. They note that the Plaintiffs allege in their Amended Complaint that La'Mello was "shot to death by a member of the Mississippi Highway Patrol," and

that later ballistics testing revealed that John Doe Mississippi Highway Patrol Trooper 1 fired the shot that killed La'Mello. [40], p. 9; [1]-1, p. 1, 9. So the Plaintiffs, they argue, have not alleged any injury that is fairly traceable to them. While unaddressed in the Parties' standing analyses, Deputy Allen's ramming of Smith's vehicle must also be considered in any standing analysis.

The Constitution gives federal courts the power to adjudicate only genuine "Cases" and "Controversies." Art. III, § 2. That power requires that litigants have standing. A plaintiff has standing only if he can "allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006) (internal quotation marks omitted); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561, 112 S. Ct. 2130, 119 L.Ed.2d 351 (1992). This requirement has been broken down into three elements.

First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan*, 504 U.S. 555, 560; *see also Warth v. Seldin,* 422 U.S. 490, 508, 95 S. Ct. 2197, 2210, 45 L.Ed.2d 343 (1975); *Sierra Club v. Morton,* 405 U.S. 727, 740–741, n. 16, 92 S. Ct. 1361, 1368–1369, n. 16, 31 L.Ed.2d 636 (1972); and *Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S. Ct. 1660, 1665, 75 L.Ed.2d 675 (1983)). Second, there must be a causal connection between the injury and the conduct complained of—the injury must be "fairly . . . trace[able] to the challenged action of the defendant," and not the result of independent, third-party action. *Lujan*, 504 U.S. 555, 560–561 (citing *Simon v. E. Ky. Welfare Rts. Org.,* 426 U.S. 26, 41–42, 96 S. Ct. 1917, 1926, 48 L.Ed.2d 450 (1976)). Finally, it must be "likely," rather than merely "speculative," that the injury will be "redressed by a favorable decision." *Id.* at 561 (citing *Simon*, 426 U.S. at 38, 43).

Since these elements are not mere pleading requirements but "rather an indispensable part of the plaintiff's case," each element must be supported just like any other matter on which the plaintiff bears the burden of proof—with "the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. 555, 560–561 (citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 883–889, 110 S. Ct. 3177, 3185–3189, 111 L.Ed.2d 695 (1990). Here, at the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, "for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (internal quotations omitted).

These Defendants argue that because La'Mello was allegedly "shot to death by a member of the Mississippi Highway Patrol," and later ballistics testing confirmed that John Doe Mississippi Highway Patrol Trooper 1 fired the shot that killed La'Mello, the Plaintiffs' claims are not fairly traceable to them. [40], p. 9; [1]-1, p. 1, 9. They are correct. Knowing that there is a specific officer, Highway Patrol Trooper 1, who accidentally shot and killed La'Mello necessarily excludes every individually named Defendant here, since they are not "Highway Patrol Trooper 1."

The Plaintiffs counter that the Fifth Circuit has held that shootings involving multiple law enforcement officers do not require specific findings of who delivered the actual killing stroke. *Grandstaff v. City of Borger, Tex.*, 767 F.2d 161, 168 (5th Cir. 1985). There, James Grandstaff was shot multiple times by law enforcement officers who mistook Grandstaff for an armed suspect they were tracking near Grandstaff's home. *Id.* at 165. At trial, the officers claimed that "without evidence and a finding that a particular defendant fired the shot that actually struck and killed Grandstaff, there can be no constitutional deprivation laid at the feet of any officer." *Id.* at 168. The Fifth Circuit disagreed, commenting that the officers "may as well argue that no one on a firing

10

squad is responsible for the victim's death unless we know whose bullet first struck the heart. The firestorm that killed James Grandstaff was in all respects a joint operation: the same recklessness . . . and the same object." *Id.* The Fifth Circuit thus found that each participant was as much at fault as the others, and all were liable because "each officer who fired his gun encouraged others to do the same." *Id.*

This case is distinguishable for one key reason—the argument in *Grandstaff* revolved around the fact that identity of the officer who killed Grandstaff was *unknown*. Grandstaff appears to have been shot multiple times, and so the death blow could have been delivered by any one of, or all of, the officers who opened fire. *Grandstaff*, 767 F.2d at 168 (noting that the officers "poured their gunfire at the truck and into the person of James Grandstaff."). Hence, the Fifth Circuit comparing the shooting to the work of a firing squad. *Id.* The unknown identity of the killer, and the fact that Grandstaff was shot multiple times, was sufficient to return a verdict against every officer who fired their gun. *Id.* And, in the 1980s, the law enforcement in *Grandstaff* apparently did not use the advanced ballistics testing that was used here. Moreover, standing—the question here, was of no issue in *Grandstaff* likely because the identity of the killer was *unknown*.

But unlike in *Grandstaff*, the identity of the officer here *is known*, at least enough to absolve these individual Defendants. Ballistics testing revealed that the law enforcement officer who shot La'Mello—the only bullet to strike the child—was *not* Troy Peterson, Chris Allen, Harry Moskowitz, or Michael Moran. [1]-1, p. 1, 9. In fact, Sheriff Peterson and Deputy Allen *did not even fire* their weapons. *Id.* So the Plaintiffs cannot meet the second element of standing: a *causal connection* between the injury and the conduct complained of. *Lujan*, 504 U.S. 555, 560–561. Thus,

the Plaintiffs lack standing to bring this claim against Sheriff Peterson, Deputies Allen and Moskowitz, and Officer Moran, or their employers, the City of Gulfport and Harrison County.

But the Plaintiffs do have standing to bring claims against Deputy Allen because he was the officer who rammed Smith's vehicle into the median, constituting a seizure.[6] And because there is standing to bring that claim against Deputy Allen in his official capacity, there is also standing to sue Deputy Allen's employer, Harrison County.[7]

While several Defendants are being dismissed because the Plaintiffs lack standing to bring their federal claims against those Defendants, the Plaintiffs' federal claims against *every* Defendant, regardless of standing, also lack merit. The Court will explain why. This merits analysis for every Defendant is necessary for at least three reasons: First, to illustrate that dismissal would still be proper regardless of any potential error in the standing analysis. Second, to make it clear that any dismissal would also apply to any unnamed officers who fired a shot that day. And third, because some of the Plaintiffs' claims against the Defendants raise specialized issues of law under Section 1983—namely, bystander liability and *Monell* liability—and a merits analysis is helpful in addressing those claims.

---

[6] A seizure occurs when an officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19 n.16, 88 S. Ct. 1868, 20 L.Ed.2d 889 (1968).

[7] The Supreme Court has emphasized "that official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent." *Hafer v. Melo*, 502 U.S. 21, 25, 112 S. Ct. 358, 361, 116 L. Ed. 2d 301 (1991). Moreover, neither Harrison County nor the City of Gulfport have specifically argued that standing does not exist simply because they are the officers' employers, and not the officers themselves.

**B. Claims under Section 1983**

Section 1983 provides a remedy against one who "under color of any statute, ordinance, regulation, custom, or usage, of any State" violates another's constitutional rights. 42 U.S.C. § 1983. To recover, plaintiffs "must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law." *James v. Tex. Collin Cnty.,* 535 F.3d 365, 373 (5th Cir. 2008) (internal quotations omitted). Alleged here are violations of La'Mello's Fourth and Fourteenth Amendment rights against unreasonable seizure, use of excessive force, and failure to intervene by the Defendants.[8] [1]-1, p. 12-16.

**a. Qualified Immunity**

The individual Defendants: Sheriff Peterson, Deputies Allen and Moskowitz, and Officer Moran also argue that the Plaintiffs' Fourth and Fourteenth Amendment claims lack merit because they are entitled to qualified immunity. [40], p. 2. Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v.*

---

[8] The Plaintiffs first proffer an interesting argument that under the plain language of the Civil Rights Act of 1871 as passed by Congress, the doctrine of qualified immunity—as it is based on State custom—is barred. [1]-1, p. 17; [47], p. 3, n. 1. In support, the Plaintiffs cite *Rogers v. Jarrett*, where Judge Willett, in a case in which he wrote the opinion that affirmed a grant of qualified immunity for prison staffers, also penned a concurrence detailing recent scholarship that "paints the qualified immunity doctrine as flawed—foundationally—from its inception." 63 F.4th 971, 979 (5th Cir.), *cert. denied*, 144 S. Ct. 193, 217 L. Ed. 2d 79 (2023) (J. Willett, concurring) (citing Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 CAL. L. REV. 201 (2023). Nevertheless, as Judge Willett observed, no matter how "seismic the implications, as middle-management circuit judges, [the Fifth Circuit] cannot overrule the Supreme Court" and "only that Court can definitively grapple with Section 1983's enacted text and decide whether it means what it says—and what, if anything, that means for Section 1983 immunity jurisprudence." *Id.* at 981. If a Fifth Circuit panel cannot "definitively grapple" with Section 1983's text in a way that runs contrary to Circuit or Supreme Court precedent, this Court *certainly* cannot.

*Fitzgerald,* 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L.Ed.2d 396 (1982). Determining whether a government official is entitled to qualified immunity involves a two-question analysis. *Saucier v. Katz,* 533 U.S. 194, 121 S. Ct. 2151, 150 L.Ed.2d 272 (2001), *overruled in part by Pearson v. Callahan,* 555 U.S. 223, 129 S. Ct. 808, 172 L.Ed.2d 565 (2009).

The first "constitutional violation question" is, whether taking the facts in the light most favorable to the plaintiff, the officer's alleged conduct violated a constitutional right. *Saucier*, 533 U.S. at 201. If the alleged conduct did not violate a constitutional right, the inquiry ends because there is no constitutional violation for which the government official would need qualified immunity. *Id.* But if the alleged conduct does amount to a constitutional violation, one must move to the second, "qualified immunity question"—that is, whether the right was *clearly established* at the time of the conduct. *Id.* (emphasis added). Qualified immunity allows for officers to make reasonable mistakes about whether their conduct violates the law, and an officer's mistake is reasonable when there are insufficient indicia that this conduct was illegal. *See Freeman v. Gore,* 483 F.3d 404, 415 (5th Cir. 2007). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. If the answer to *both* the constitutional violation and qualified immunity questions is yes, the officer is *not* entitled to qualified immunity. *Lytle v. Bexar Cnty., Tex.*, 560 F.3d 404, 410 (5th Cir. 2009).

Claims of excessive force in conducting a seizure, as here, further jumbles the *Saucier* inquiry. *Lytle*, 560 F.3d at 410. This complication stems from having to make two "overlapping objective reasonableness inquir[ies]." *Saucier*, 533 U.S. at 210 (J. Ginsburg, concurring). In these cases, the first "constitutional violation question" asks whether the officer's

seizure met the Fourth Amendment's reasonableness requirement. *Lytle*, 560 F.3d at 410. And if that officer's conduct was *unreasonable*, the inquiry proceeds to the second, "qualified immunity question"—whether the law was sufficiently clear that a reasonable officer would have known that his conduct violated the constitution. Put another way, this second, "somewhat convoluted question" asks whether the law lacked such clarity that it would be reasonable for an officer to erroneously believe that his conduct was reasonable. *Lytle*, 560 F.3d at 410.

So here, the two questions are: (1) whether the individual Defendants' alleged conduct amounted to an unreasonable seizure, in violation of La'Mello's constitutional rights, and if so, (2) whether the law was sufficiently clear that a reasonable officer would have known that his conduct violated La'Mello's constitutional rights. The Plaintiffs assert that Officer Moran and Deputies Allen and Moskowitz used excessive force by shooting in the direction of La'Mello and the car in which he was in, as well as ramming the vehicle in which he was unrestrained, violating La'Mello's Fourth Amendment and Fourteenth Amendment rights to be free from an unreasonable seizure. [1]-1, p. 14-15.

"The Fourth Amendment protects against the unconstitutional seizure or arrest of persons, and use of force in any arrest." U.S. CONST. amend. IV. "A 'Fourth Amendment seizure' occurs 'when there is a governmental termination of freedom of movement *through means intentionally applied.*'" *Brower v. Cty. of Inyo*, 489 U.S. 593, 597 (1989) (emphasis in original). As alleged, there are two possible "seizures" here: (1) shooting La'Mello, and (2) Deputy Allen ramming Smith's vehicle off the road. These will be addressed one at a time.

The Shooting

The Fifth Circuit has acknowledged that being shot, even unintentionally, can invoke the Fourth Amendment. *See Lytle*, 560 F.3d at 410 (5th Cir. 2009) (noting that "[t]he parties do not dispute . . . that Heather Lytle was "seized" within the meaning of the Fourth Amendment when O'Donnell's bullet struck her."). Indeed, just being shot at, under the right facts, can be enough to raise claims under the Fourth Amendment.[9] See *Summers v. Hinds Cnty., Mississippi*, 508 F. Supp. 3d 124, 132 (S.D. Miss. 2020). So the question turns to whether that seizure was objectively reasonable. After all, the constitution protects against only *unreasonable* seizures—not all seizures. *See Morgan v. Chapman*, 969 F.3d 238, 246 (5th Cir. 2020) (affirming the right to be free of unreasonable searches and seizures).

Assessing the reasonableness of a police officer's use of force involves "a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham v. Connor,* 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L.Ed.2d 443 (1989) (quoting *Tennessee v. Garner,* 471 U.S. 1, 8, 105 S. Ct. 1694, 85 L.Ed.2d 1 (1985)). This balancing "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. The reasonableness of an officer's conduct is judged "objectively," that is, without reference to the subjective intent or motivation that underlies the officer's

---

[9] The Fifth Circuit has twice found excessive force violations where officers fired at vehicles or dwellings holding suspects and innocent third parties. *See Petta v. Rivera*, 143 F.3d 895 (5th Cir. 1998) (holding that an officer's shots were "directed not only towards [the children's mother] but towards the car that [the children], too, occupied"); *Coon v. Ledbetter*, 780 F.2d 1158, 1160–61 (5th Cir. 1986) (finding that a suspect's four-year-old daughter stated an excessive force claim because officers knew, or should have known, that she was in her father's trailer when officers shot into it).

conduct. *Id.* at 397. The facts and circumstances "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" are also considered. *Id.* at 396. This includes accounting for the difficult and often split-second decisions that police officers must make in carrying out their duties. *Id.* at 396–97.

Here, in the Court's "judicial experience and common sense," no reasonable jury could find that Officer Moran's and Deputy Moskowitz's use of force in firing their service weapons to defend against and subdue Smith, a murderer who had just fired first at law enforcement, was objectively unreasonable. *Ashcroft*, 556 U.S. at 678; *and see Jaques v. Town of Londonberry*, 54 F. App'x 14, 16 (1st Cir. 2002) (finding that "given the compressed time frame, the highly charged environment, and the kaleidoscopic sequence of events, a rational jury could not find that Sgt. Dussault's return of fire was objectively unreasonable"); *Cabell v. Rousseau*, 130 F. App'x 803, 807 (7th Cir. 2005) (holding that in the execution of a warrant, officers did not act unreasonably by returning fire because police may respond to mortal threats with a proportionate amount of force, including deadly force); *and Ellison v. City of Montgomery*, 85 F. Supp. 2d 1178, 1182 (M.D. Ala. 1999), *aff'd*, 55 F. App'x 900 (11th Cir. 2002) (noting that "any reasonable juror would undoubtedly conclude that [the officers'] use of deadly force in self-defense against Ellison's gunshots was well within the realm of constitutionally permissible behavior.").

Indeed, the societal need and objective reasonableness for police officers to fire their weapons is at its zenith in response to an active shooter. *See Scott v. Harris*, 550 U.S. 372, 383 (2007) (describing the "paramount governmental interest in ensuring public safety."). There was

no unreasonable seizure stemming from La'Mello's shooting—and therefore, no constitutional violation.[10]

But even if there had been, La'Mello's constitutional right was not so clearly established that every reasonable officer would have known that their conduct was against the law, so Officer Moran and Deputy Moskowitz would still receive qualified immunity.[11] For argument's sake, the Court will briefly address why.

It bears repeating that qualified immunity's second prong "requires the plaintiff to 'identify a case'—usually, a 'body of relevant case law'—in which 'an officer acting under similar circumstances . . . was held to have violated the [Constitution].'" *Dawes v. City of Dallas*, 2022 WL 3273833, at *6 (N.D. Tex. Aug. 11, 2022) (citing *Joseph v. Bartlett*, 981 F.3d 319, 330 (5th Cir. 2020). A right is "clearly established" only if preexisting precedent "ha[s] placed the . . . constitutional question beyond debate." *Harmon v. City of Arlington*, 16 F.4th 1159, 1165 (5th Cir. 2021). And that burden is "heavy." *Id.* "[A]s the Supreme Court has repeatedly admonished lower courts, we must define [the] constitutional question with specificity." *Id.* at 1166. The dispositive question is whether the violative nature of *particular* conduct is clearly established. *Id.* (emphasis in original).

---

[10] The Plaintiffs put forth in their Amended Complaint that it is a "foundational principal of law enforcement training that officers should refrain from the use of deadly force when confronted by a situation in which innocent civilians may be injured or killed." [1]-1, p. 10. But at the motion hearing, the Plaintiffs argued instead that law enforcement may use deadly force only when they have a "clear shot" at the target. Yet nowhere do they allege that Officer Moran or Deputy Moskowitz lacked clear shots at Smith when they fired—they could have simply missed their target. As alleged, Smith rolled down his window, where he seemingly could be seen by law enforcement, and began firing his weapon. [1]-1, p. 8.

[11] The analysis for the lack of a constitutional violation and, at the very least, that any constitutional violation was not clearly established, applies equally to the unnamed Mississippi Highway Patrolman who fired the fatal shot and to any other law enforcement officer who fired a shot that day.

This specificity requirement assumes special significance in excessive force cases, where officers must make split-second decisions to use force. *Harmon*, 16 F.4th at 1166. "[O]vercoming qualified immunity is especially difficult in excessive-force cases." *Morrow v. Meachum*, 917 F.3d 870, 876 (5th Cir. 2019). And courts must refrain from the temptation of "Monday-morning quarterbacking" an officer's split-second decisions. *Dawes*, 2022 WL 3273833, at *12. "[P]olice officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Harmon*, 16 F.4th at 1166 (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018)). Indeed, a clearly established right is "sufficiently clear that *every reasonable official* would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. ---, ---, 132 S. Ct. 2088, 2093, 182 L.Ed.2d 985 (2012) (emphasis added). If that sounds like a high bar, it is because it is—qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L.Ed.2d 271 (1986).

The general rule is when an officer uses deadly force, that deadly force is considered excessive and unreasonable "unless the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Romero v. City of Grapevine*, 888 F.3d 170, 176 (5th Cir. 2018) (quoting *Garner*, 471 U.S. at 11). The Defendants had probable cause to believe that Smith posed a threat of serious physical harm—he had murdered two people, previously shot at law enforcement in Hancock County, kidnapped his son, and just opened fire again. La'Mello's presence at the scene due to Smith's violent and irate actions—while heartbreaking—does not change the outcome based on the law. *See Cooper v. Rutherford*, 503 F. App'x 672 (11th Cir. 2012) (granting qualified immunity for police officers after potential

hostages—a mother and child—were shot by the officers while the officers were trying to shoot the armed bank robber seeking to steal the car the mother and child were in).

The Fifth Circuit has discussed qualified immunity situations when the victim was an innocent passenger. In *Lytle*, the Fifth Circuit denied qualified immunity to a police officer who fired at a fleeing car and killed one of the suspect's passengers. *Lytle*, 560 F.3d at 404. That holding turned on the Fifth Circuit's finding that the car was moving away from the officer and had already traveled some distance when the officer opened fire. *Id.* at 409. The Fifth Circuit held that a reasonable jury could conclude that a receding car "did not pose a sufficient threat of harm such that the use of deadly force was reasonable." *Id.* at 416. In doing so, the Fifth Circuit recognized that if the facts were as the officer alleged, and he fired as the car was coming towards him, "he would likely be entitled to qualified immunity" based on the "threat of immediate and severe physical harm." *Id.* at 412. Here, responding with deadly force while Smith was actively firing a weapon at law enforcement is completely different than in *Lytle*, where the suspect was driving away from the officer and posed no "threat of immediate and severe physical harm." *Id.*

The Plaintiffs further cite *Coon v. Ledbetter*, and argue it is analogous to the situation here. [47], p. 9-10; 780 F.2d 1158, 1160–61 (5th Cir. 1986). But that case is distinguishable for at least one critical reason. Once Coon stumbled into the trailer, ostensibly to protect his daughter from police gunfire, only then, after a standoff and an attempt to get Coon to cooperate, did the police deputy fire indiscriminately into the trailer without even seeing Coon. *Coon*, 780 F.2d at 1160–61. The recklessness of firing buckshot into a trailer in which a suspect, no longer actively firing his weapon, had fled is quite different than here, where Smith could be seen and was actively firing at law enforcement. *Id.* Ultimately, even if there had been a constitutional violation—which there was

20

not—the violation was not so clearly established that it would defeat qualified immunity for Officer Moran and Deputy Moskowitz.[12]

The Plaintiffs also have no Fourteenth Amendment claim. The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Such substantive due process claims preclude liability unless a defendant's actions were "arbitrary or conscience shocking." *Collins v. City of Harker Heights,* 503 U.S. 115, 128, 112 S. Ct. 1061, 1070, 117 L.Ed.2d 261 (1992). "[O]nly the most egregious official conduct can be said to be 'arbitrary in the constitutional sense[.]'" *Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 846, 118 S. Ct. 1708, 1716, 140 L.Ed.2d 1043 (1998) (quoting *Collins,* 503 U.S. at 129, 112 S. Ct. at 1070).

First, the Plaintiffs' Fourteenth Amendment claim falters because a Fourth Amendment seizure already took place (La'Mello's shooting), and so there is no remedy under the Fourteenth Amendment. "A Fourteenth Amendment excessive force claim covers any excessive force applied when Plaintiffs *were not seized* within the meaning of the Fourth Amendment." *Summers v. Hinds Cnty., Mississippi*, 650 F. Supp. 3d 502, 513 (S.D. Miss. 2023). Second, even if there were no Fourth Amendment seizure, Officer Moran's and Deputy Moskowitz's actions of returning fire at an armed and dangerous suspect do not shock the conscience. *Collins,* 503 U.S. at 128. After all, when

---

[12] The Plaintiffs also make two roadblock-related arguments. First, they assert that Smith should have been allowed to proceed to the first roadblock, where he could have been apprehended. But this assumes that Smith would have, all of a sudden, peacefully surrendered, thereby negating the use of the deadly force employed. Given the day's events, this is speculative at best. After all, Smith had murdered two people, kidnapped La'Mello, shot at officers earlier, and was continuing to evade police while driving on rims down the interstate. Second, the Plaintiffs contend that Smith could have been subdued by a sniper at the second roadblock. This argument, too, is nothing but conjecture—it first assumes that Smith would have somehow rammed his way, or shot his way, past the first roadblock, potentially injuring or killing officers or onlooking civilians in the process. And next, that a sniper would have had the "clear shot," the Plaintiffs require, to take out Smith without harming La'Mello. This is also a stretch given that in reality, Smith was shot with a rifle, not a handgun, from close range, and La'Mello was still hit.

officers are forced to make immediate, hasty decisions, "even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock" that implicates the Constitution. *Id.* at 853–54. Indeed, purpose to "cause harm is needed for due process liability in a pursuit case." *Id.* So Plaintiffs' Fourteenth Amendment claims involving La'Mello's shooting are also without merit.

### The Ramming

While mostly unaddressed by the parties beyond a reference in the Amended Complaint, Deputy Allen ramming Smith's vehicle was also a seizure under the Fourth Amendment. *See Scott*, 550 U.S. at 381 (noting that the parties did not "contest that [defendant's] decision to terminate the car chase by ramming his bumper into respondent's vehicle constituted a "seizure"); *Brower,* 489 U.S. at 597 (finding that if "the police cruiser had pulled alongside the fleeing car and sideswiped it, producing the crash, then the termination of the suspect's freedom of movement would have been a seizure"). That said, the Plaintiffs allege no injury to La'Mello that resulted from the ramming itself, and even admitted at the motion hearing that the ramming itself was not a constitutional violation. The only argument they make seeks to link the ramming to the shooting— illustrating an alleged unnecessary escalation of the situation that led to La'Mello's death. [1]-1, p. 15. Because there was no alleged injury from the ramming, and even if there were, it would not rise to a constitutional violation, the Plaintiffs have no viable Fourth or Fourteenth Amendment claims.[13]

---

[13] The Amended Complaint admits that Smith, wanted as a suspect in a double murder investigation, kidnapped his child, armed himself with a gun, and led police on an interstate chase of over 100 miles. [1]-1, p. 2-8. At the time of the ramming, Smith had already shot at law enforcement officers and was continuing to evade capture, despite several previous attempts to disable his vehicle in other ways. *Id.* at p. 5. This reasoning is congruent with Supreme Court cases reviewing excessive force claims in connection with high-speed chases. In *Scott,* the Supreme Court held that an officer did not violate the Fourth Amendment by ramming a fugitive's car, whose reckless driving "posed an actual and imminent threat to the lives of any pedestrians who might have been present, to other civilian

### b. Bystander Liability

The Plaintiffs also allege failures to intervene because every Defendant "had the duty to prevent others from depriving La'Mello of his civil rights and refused to do so." [1]-1, p. 15-16. This is also known as "bystander liability." *See Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013) (acknowledging bystander liability allegations under Section 1983 because a police officer allegedly "failed to stop Ariaz, a fellow officer, from violating Whitley's" constitutional rights).

Section 1983 bystander liability arises "where the officer (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Hamilton v. Kindred*, 845 F.3d 659, 663 (5th Cir. 2017) (internal quotations omitted). But as discussed, no constitutional right was violated. And therefore, there can be no *failure to intervene* in preventing a violation. "Bystander liability arises only where the plaintiff can allege and prove another officer's use of excessive force." *Buehler v. Dear*, 27 F.4th 969, 989 (5th Cir. 2022) (quoting *Windham v. Harris Cnty.*, 875 F.3d 229, 243 n. 19 (5th Cir. 2017); *see also Jones v. Gammage*, No. 4:20-CV-220-SA-JMV, 2023 WL 1453154, at *23 (N.D. Miss. Feb. 1, 2023) (while finding a plausible bystander liability claim, the court noted that without an alleged underlying constitutional violation, the bystander liability claim would fail as a matter of law). Indeed, inherent in "a bystander claim is the necessity for a constitutional violation to which the officer must respond." *Stafford v. Zwicke*, No. SA-22-CV-00314-OLG, 2023 WL 5677859, at *5

---

motorists, and to the officers involved in the chase." *Scott,* 550 U.S. at 384. And in *Plumhoff*, the Supreme Court reaffirmed *Scott* by holding that an officer acted reasonably when he fatally shot a fugitive who was "intent on resuming" a chase that "pose[d] a deadly threat for others on the road." *Plumhoff v. Rickard,* 572 U.S. ––––, 134 S. Ct. 2012, 2022 188 L.Ed.2d 1056 (2014). In those cases, the Supreme Court declined to find that the use of deadly force in connection with a dangerous car chase violated the Fourth Amendment, let alone find that it was a basis for denying qualified immunity. *See Mullenix v. Luna*, 577 U.S. 7, 15, 136 S. Ct. 305, 310, 193 L. Ed. 2d 255 (2015).

(W.D. Tex. Aug. 23, 2023) (citing *Whitley*, 726 F.3d at 646). Accordingly, the Plaintiffs' failure to intervene claims are dismissed.

### c. Municipal Liability under Section 1983

The Plaintiffs also bring Section 1983 claims against the Mississippi Department of Public Safety, the City of Gulfport, and Harrison County, alleging that "the formal and informal actions of these . . . Defendants reflect policies, practices, customs, and procedures that permit and cause constitutional violations."[14] [1]-1, p. 18. Specifically, the Mississippi Department of Public Safety, the City of Gulfport, and Harrison County allegedly refused to "develop policies, train, and supervise their officers regarding the chain of command and interagency communication issues" and this failure "led directly to a confused, uncoordinated law enforcement response, which was the moving cause behind La'Mello's death." *Id.*

Municipalities and other local governments may be sued only under Section 1983 if the plaintiff's alleged deprivation of rights stems from the government's unconstitutional or illegal policies. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Littell v. Houston Indep. Sch. Dist.*, 894 F.3d 616, 622 (5th Cir. 2018). The bar on vicarious liability requires deliberate action attributable to the municipality that is the direct cause of the alleged constitutional violation. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 392, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989). What this means is that a local government entity may be sued "if it is alleged to have caused a constitutional tort through 'a policy statement, ordinance, regulation, or decision officially adopted

---

[14] As mentioned above, though the Plaintiffs brought these claims against the Mississippi Department of Public Safety, they later conceded that they have no pathway to recovery since the Mississippi Department of Public Safety is a state entity. [45], p. 6. *See Mt. Healthy Bd. of Ed.,* 429 U.S. at 280 (holding that *Monell* liability does not apply to "[s]tates or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes.").

24

and promulgated by that body's officers.'" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988) (quoting *Monell*, 436 U.S. at 690). To be successful, there must be: "1) a policymaker; 2) an official policy; 3) and a violation of constitutional rights whose 'moving force' is the policy or custom.'" *Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003) (citing *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)).

This analysis begins and ends with the third element. The Plaintiffs cannot meet that element since there *was no underlying violation* of constitutional rights for any alleged policy or custom to be the moving force behind. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (holding that "if a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point." (emphasis in original)); *and Hicks-Fields v. Harris Cnty., Texas*, 860 F.3d 803, 808 (5th Cir. 2017) (noting that, "as is well established, every *Monell* claim requires an underlying constitutional violation."). With no avenue for municipal liability against the Mississippi Department of Public Safety, the City of Gulfport, or Harrison County, those claims are dismissed.

## C. State Law Claims

Along with the federal claims raised, the Plaintiffs also assert a host of other state law claims under the Mississippi Tort Claims Act. [1]-1, p. 11-14. Particularly with respect to supplemental jurisdiction, "a federal court has subject-matter jurisdiction over specified state-law claims, which it may (or may not) choose to exercise." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639, 129 S. Ct. 1862, 173 L.Ed.2d 843 (2009) (citing 28 U.S.C. § 1367). "A district court's

decision whether to exercise that jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary." *Id.* (citing 28 U.S.C. § 1367(c)).

District courts may decline to exercise supplemental jurisdiction if: (1) the claim raises a novel or complex issue of State law; (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction; (3) the district court has dismissed all claims over which it has original jurisdiction; or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction. 28 U.S.C. § 1367(c). Along with the Section 1367(c) factors, the "common law factors of judicial economy, convenience, fairness, and comity" should also be considered. *McGee v. Felder Servs., LLC*, No. 3:22-CV-215-DMB-RP, 2024 WL 69912, at *1 (N.D. Miss. Jan. 5, 2024) (citing *Enochs v. Lampasas Cnty.*, 641 F.3d 155, 159 (5th Cir. 2011). The general rule in the Fifth Circuit "is that a court should decline to exercise jurisdiction over remaining state law claims when all federal-law claims are eliminated before trial[.]" *Brookshire Bros. Holding, Inc. v. Dayco Prod. Inc.*, 554 F.3d 595, 602 (5th Cir. 2009).

First, the common law factors favor declining supplemental jurisdiction here. When the federal claim has been settled before trial, "considerations of judicial efficiency and economy can no longer justify the continued exercise of federal jurisdiction over ancillary state-law claims." *Sw. Motor Transp. v. Giraffe Logistics*, No. 9-cv-143, 2009 WL 3427358, at *2 (W.D. Tex. Oct. 23, 2009) (quoting *Waste Sys. v. Clean Land Air Water Corp.*, 683 F.2d 927, 931 (5th Cir. 1982)). Nor is it unfair or inconvenient for the state law claim to be heard in state court—especially at this early stage and before discovery. *Enochs*, 641 F.3d at 160; *see Parker & Parsley Petroleum v. Dresser Indus.*, 972 F.2d 580, 587-88 (5th Cir. 1992) (dismissal of state law claims "a few weeks" before trial would not be inconvenient or unfair because, among other things, discovery had not been completed, the

case "had been pending for only nine months," little additional "legal research would be necessary, as the surviving claims were governed by state law, in either forum," and the case would not require repeating the "effort and expense of the discovery process."). Here, no case management conference has taken place, no discovery conducted, and the final pending motion has been fully briefed for about one month. Lastly, "comity demands that the important interests of federalism and comity be respected by federal courts, which are courts of limited jurisdiction and not as well equipped for determinations of state law as are state courts." *Enochs*, 641 F.3d at 160.

Second, regarding the Section 1367(c) factors, the Plaintiffs' claims under the Mississippi Tort Claims Act might raise complex or novel state law issues, and the only claims over which original jurisdiction existed have been dismissed. *See* 28 U.S.C. § 1367(c)(3); *Spell v. Edwards*, No. 22-30075, 2023 WL 2110889, at *6 (5th Cir. Feb. 17, 2023) (stating that generally, pendent claims are dismissed when all federal claims are dismissed before trial). Thus, the state law claims "predominate over" the dismissed federal claims. *Enochs*, 641 F.3d at 159 (holding that "state law claims predominate over the non-existent federal claims"). Moreover, as noted above, the parties have extensively briefed state law issues, and federalism concerns further support allowing a state court judge to decide purely state law issues when a case is in its earliest stages. Finally, there is a compelling reason to decline jurisdiction because, as analyzed above, the common law factors support declining supplemental jurisdiction. *Id.* (noting that "the heavy balance of the common law factors in favor of remand constitutes another compelling reason to decline jurisdiction."). The majority of the Section 1367(c) factors also favor declining supplemental jurisdiction. So the Court declines to do so and remands those claims to state court. *Heggemeier v. Caldwell County, Tex.*, 826 F.3d 861, 872 (5th Cir. 2016); *Welch v. Jannereth*, 496 F. App'x 411, 413 (5th Cir. 2012) (finding that,

in a case previously removed, remand of state law claims was appropriate after dismissal of all federal law claims).

## IV. CONCLUSION

IT IS THEREFORE ORDERED AND ADJUDGED that Defendant Mississippi Department of Public Safety's Motions for Judgment of the Pleadings [37] is GRANTED IN PART and DENIED IN PART.

IT IS FURTHER ORDERED AND ADJUDGED that Defendants Michael Moran and City of Gulfport's Motion to Dismiss [39] is GRANTED IN PART and DENIED IN PART.

IT IS FURTHER ORDERED AND ADJUDGED that Defendants Chris Allen, Harry Moskowitz, and Troy Peterson's Motion to Dismiss [42] is GRANTED IN PART and DENIED IN PART.

IT IS FURTHER ORDERED AND ADJUDGED that Defendant Harrison County's Motion to Dismiss [54] is GRANTED IN PART and DENIED IN PART.

IT IS FURTHER ORDERED AND ADJUDGED that the Plaintiffs' Fourth and Fourteenth Amendment claims against Defendants Harrison County and Chris Allen, insofar as they are related to the shooting, are DISMISSED WITHOUT PREJUDICE for lack of standing. These official capacity claims against Defendant Chris Allen are DISMISSED WITHOUT PREJUDICE as duplicative of the Plaintiffs' claims against Harrison County.[15]

IT IS FURTHER ORDERED AND ADJUDGED that the Plaintiffs' Fourth and Fourteenth Amendment claims against Defendants Harrison County and Chris Allen, insofar as

---

[15] "The Fifth Circuit has held that it is appropriate to dismiss claims against officers in their official capacities when the 'allegations duplicate claims against the respective governmental entities themselves.'" *Thomas v. City of Galveston*, 800 F. Supp. 2d 826, 832 (S.D. Tex. 2011) (quoting *Castro Romero v. Becken*, 256 F.3d 349, 355 (5th Cir. 2001)).

they are related to the ramming, are DISMISSED WITH PREJUDICE for failure to state a claim. These official capacity claims against Defendant Chris Allen are DISMISSED WITH PREJUDICE as duplicative of the Plaintiffs' claims against Harrison County.

IT IS FURTHER ORDERED AND ADJUDGED that the Plaintiffs' Fourth and Fourteenth Amendment claims against Defendants City of Gulfport, Michael Moran, Harry Moskowitz, and Troy Peterson are DISMISSED WITHOUT PREJUDICE for lack of standing. These official capacity claims against Defendants Harry Moskowitz, Michael Moran, and Troy Peterson are DISMISSED WITHOUT PREJUDICE as duplicative of the Plaintiffs' claims against Harrison County and City of Gulfport.

IT IS FURTHER ORDERED AND ADJUDGED that the Plaintiffs' Section 1983 claims against Defendant Mississippi Department of Public Safety are DISMISSED WITH PREJUDICE for failure to state a claim.

IT IS FURTHER ORDERED AND ADJUDGED that the Court declines to exercise supplemental jurisdiction over the Plaintiffs' state law claims, and those claims are REMANDED to the Circuit Court of Hinds County, Mississippi, First Judicial District. All other federal claims are DISMISSED. A certified copy of this Order shall be mailed immediately by the Clerk's Office to the Circuit Clerk of Hinds County, Mississippi, First Judicial District pursuant to 28 U.S.C. Section 1447(c).

SO ORDERED THIS, the 29th day of March, 2024.


_____
TAYLOR B. McNEEL
UNITED STATES DISTRICT JUDGE